UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------

LINDA EVANGELISTA,

                              *Plaintiff,*                          **CASE NO: 21-cv-7889**

        -against-                                                  **COMPLAINT AND**
                                                                   **JURY DEMAND**
ZELTIQ AESTHETICS, INC.,

                              *Defendant.*

------------------------------------------------------------------------

Plaintiff Linda Evangelista ("Ms. Evangelista"), by her attorneys, Wrobel Markham LLP,

as and for her Complaint against defendant ZELTIQ Aesthetics, Inc. ("ZELTIQ") alleges as

follows:

## PRELIMINARY STATEMENT

Ms. Evangelista is an original '90s era Supermodel and is one of the most recognizable

and photographed women in the world. Ms. Evangelista's quality of life, her career, and her

body, however, were all ruined in 2016 after she was permanently disfigured as a result of using

ZELTIQ'S CoolSculpting System as well as the multiple procedures and surgeries required to try

to correct those physical injuries as directed by ZELTIQ. ZELTIQ created, designed, developed,

manufactured, distributed, marketed, promoted, and directly advertised its CoolSculpting System

to consumers, including Ms. Evangelista, as a safe and effective, non-invasive alternative to

liposuction surgery. ZELTIQ, however, failed to adequately warn and/or intentionally concealed

the incidence and occurrence of known serious adverse effects, including, but not limited to,

paradoxical adipose hyperplasia ("PAH") to induce consumers, including Ms. Evangelista, to

purchase treatments using the CoolSculpting System at a premium price and further its bottom

line. This products liability action seeks recovery for Ms. Evangelista's severe and permanent personal injuries and disfigurement, her pain and suffering, severe emotional distress and mental anguish, and the economic losses that she sustained as a result of being rendered unemployable and unable to earn an income as a model, all of which said damages were inflicted upon her by ZELTIQ's CoolSculpting System and the multiple procedures and surgeries required to try to correct those physical injuries as directed by ZELTIQ. Ms. Evangelista further seeks punitive damages because ZELTIQ unleashed its CoolSculpting System upon her through unlawful, false, misleading, and deceptive marketing practices and with a willful, wanton, and reckless disregard for her safety.

## PARTIES

1.      Ms. Evangelista is, and was at all relevant times, a resident of the State of New York.

2.      Upon information and belief, ZELTIQ is a Delaware corporation with its principal place of business in California.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000. ZELTIQ is a citizen of Delaware and Ms. Evangelista is a citizen of New York.

4.      ZELTIQ, at all times relevant herein, was in the business of creating, designing, testing, manufacturing, labeling, advertising, marketing, promoting, selling, and distributing its CoolSculpting System and developed, manufactured, distributed,

labeled, advertised, marketed, promoted, and/or sold its CoolSculpting System into the stream of commerce for use by the public, including Ms. Evangelista.

5.      ZELTIQ has transacted and conducted business in the State of New York and has derived substantial revenue from goods and products used in the State of New York.

6.      The Court has personal jurisdiction over ZELTIQ because ZELTIQ has sufficient minimum contacts with this District and regularly conducts business within this District such that exercising jurisdiction over ZELTIQ would not offend due process or traditional notions of fair play and substantial justice.

7.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because ZELTIQ is subject to the Court's personal jurisdiction in this District.

**FACTS**

**ZELTIQ's CoolSculpting System**

8.      ZELTIQ, directly or through its agents, servants, and employees, created, designed, developed, manufactured, distributed, labeled, advertised, marketed, promoted, and/or sold its CoolSculpting System to be used on individuals to induce lipolysis, the breaking down of fat cells in the body, and its CoolSculpting System was used on Ms. Evangelista for that purpose.

9.      ZELTIQ, directly or through its agents, servants, and employees, created, designed, developed, manufactured, distributed, labeled, advertised, marketed, promoted, and/or sold its CoolSculpting System as a "no surgery, no anesthesia, no downtime" alternative to liposuction surgery.

10.     CoolSculpting is a wholly elective, cosmetic treatment that supposedly removes fat from the body, targeting those areas of the body where it is difficult to lose stubborn fat – *i.e.,*

the abdomen, flanks, back and bra area, inner thighs, and the chin – through a process called cryolipolysis or "fat-freezing."

11.     ZELTIQ's CoolSculpting System is a Class II medical device, as defined and categorized by the U.S. Food and Drug Administration ("FDA").

12.     ZELTIQ's CoolSculpting System was first cleared by the FDA pursuant to the 501(k) process on or about May 31, 2006 to be used as a skin cooling device to minimize pain and thermal injury during laser and dermatological treatments and as a local anesthetic for procedures that induce minor local discomfort.

13.     The FDA did not clear ZELTIQ's CoolSculpting System to be used to induce lipolysis until August 24, 2010.

14.     ZELTIQ's CoolSculpting System works by pulling the flesh of the treated area between two paddles and cooling it to below freezing temperatures for a period of thirty minutes or more to kill the fat cells in that area.

15.     Upon information and belief, the frozen, dead fat cells are absorbed by the body and excreted in the four to six month period following the CoolSculpting procedure with the promise of a more contoured appearance in the treated area, according to ZELTIQ.

**CoolSculpting Is an Elective Cosmetic Treatment and the CoolSculpting System Device Does Not Require A Medical Doctor To Prescribe or Administer It**

16.     According to ZELTIQ, "the CoolSculpting procedure is not technique-dependent, does not require significant training or skill, and is largely automated." ZELTIQ 2011 10-K, p. 2.

17.     The CoolSculpting System does not require a medical doctor to administer it.

4

18.     CoolSculpting is offered and performed by dermatologists and estheticians – non-medical professionals who typically perform facials, hair removal, and other beauty and skin treatments – alike.

19.     ZELTIQ even offers an educational program –the CoolSculpting University and CoolSculpting Masters Course – to train non-medical and medical professionals in "the proper techniques for T2T, including a complete treatment assessment, applicator placement and patient consultation. Customers are also trained on specific practice enhancement execution protocols designed to accelerate utilization and maximize the use of their CoolSculpting offering that includes branding, grassroots initiatives and digital marketing tactics." ZELTIQ 2011 10-K, p. 2.

20.     In fact, ZELTIQ has awarded several non-medical professionals a "CoolSculpting University Masters" and expressly allows and encourages the non-medical professionals to market themselves as a CoolSculpting Master Specialist to the general public.

**ZELTIQ Controls CoolSculpting Providers' Messaging and Patient Information**

21.     ZELTIQ also instructs both medical and non-medical professionals on how to engage patients, perform patient consultations, and sell the CoolSculpting System.

22.     In ZELTIQ's promotional brochure, "*Preparing Your Practice for CoolSculpting*," ZELTIQ specifically instructs practices to prepare their staff with "CoolSculpting talking points" and a "phone script" to control the narrative surrounding CoolSculpting with representations such as:

- **"The Main CoolSculpting Message"**
  CoolSculpting is the safe, non-invasive way to reduce fat in common trouble areas that tend to be diet- and exercise-resistant;

- **"What happens during the procedure?"**
  Using a technology developed by Harvard scientists, CoolSculpting targets and freezes fat cells causing their natural death in the treatment area. It's completely

non-invasive so there is no cutting, no needles and no anesthesia; and

- **"Is CoolSculpting safe? Painful? Are there side effects?"**
  CoolSculpting is medically cleared for the flanks and proven safe. Some patients may experience temporary pain or discomfort.

23.    ZELTIQ's promotional brochure, "*Reaching Your CoolSculpting Patient*

*Segments,*" ZELTIQ advises healthcare professionals on how to sell the CoolSculpting

System to patients..

24.    "*Reaching Your CoolSculpting Patient Segments*" contains sample

advertising copy for medical practices to use when selling CoolSculpting and contains the

following representations by ZELTIQ:

- **NO SURGERY. NO DOWNTIME. UNMISTAKEABLE RESULTS** . . . the CoolSculpting procedure requires no surgery or downtime, so you're in and out of the office like always;

- **LET US INTRODUCE YOU TO SIMPLE NEW WAYS TO LOOK YOUR BEST, NO SURGERY REQUIRED**. . .the CoolSculpting procedure helps eliminate stubborn fat by freezing fat cells, safely and simply. Non-surgical treatments don't require downtime. . .; and

- the CoolSculpting procedure eliminates fat cells safely and simply, without surgery or down time.

25.    In a document prepared by ZELTIQ entitled CoolSculpting Consumer

FAQ – US that was labeled confidential and not for distribution, ZELTIQ provided a

Q&A about CoolSculpting that ZELTIQ "intended to guide CoolSculpting Center

physicians during media interviews." Among other things, ZELTIQ stated that:

- Q: HOW DO PATIENTS FIND DOCTORS THAT OFFER COOLSCULPTING?
  A: CoolSculpting is made available only to premiere accredited doctors and treatment centers. Current distribution consists of dermatologists, plastic surgeons and other aesthetic specialists. . . . ZELTIQ encourages consumers to do their homework and ensure they accept no substitutes for CoolSculpting.

- Q: IS COOLSCULPTING SAFE? PAINFUL? SIDE EFFECTS?

6

A: CoolSculpting is safe and generally comfortable for most patients . . . Approximately 50 reported cases out of 115,000 treatments, patients experienced more severe pain during and/or after treatment . . . In 100% of cases, pain has naturally subsided over time and there have been no long-term effects of treatment.

- Q: WHAT CAN PEOPLE EXPECT IN TERMS OF FAT REDUCTION – WHAT IS THE AVERAGE OUTCOME?
  A: In all CoolSculpting cases, patients will experience an undeniable reduction in fat in the area treated.

26.     ZELTIQ's narratives and promotional materials encouraged CoolSculpting providers to stress the safety, efficacy, and non-invasive nature of the CoolSculpting System and to minimize any possible side effects to "temporary pain or discomfort."

**CoolSculpting Providers Are Incentivized To Upsell CoolSculpting Treatments**

27.     Moreover, a CoolSculpting provider must make a substantial upfront investment when purchasing a CoolSculpting System device, and the device is specifically programmed to function only with the use of consumable cards, or "cycles," that a provider must purchase in advance from ZELTIQ to operate the CoolSculpting device at an average cost between $650 to $800 per cycle.

28.     "A cycle is an authorization to perform one procedure to one specific area on the body; [providers] can only perform a treatment if they have purchased a cycle." ZELTIQ 2015 10-K, p. 6.

29.     The CoolSculpting provider's financial investment in the CoolSculpting System and consumable cards, or "cycles," incentivizes the provider to upsell its CoolSculpting services and seek out clients on whom they can use the CoolSculpting device and not exercise independent judgment based on the consumer's needs.

30.     In its Guidelines for CoolSculpting Success, ZELTIQ includes sample scripts for use on prospective CoolSculpting clients and describes specific upselling methods such as

having the patients return for a "follow-up appointment" where the provider has an opportunity to sell additional CoolSculpting treatments, or "cycles," or by pre-selling CoolSculpting packages where the client pays for multiple cycles in advance for future use.

**ZELTIQ Knew the Risk of PAH Associated with Use of the CoolSculpting System and Failed to Warn and/or Intentionally Withheld Material Information from Consumers**

31.     ZELTIQ markets, promotes, advertises, and sells the CoolSculpting System directly to consumers, through television commercials, radio commercials, magazine advertisements, social media, and ZELTIQ's website, as a non-invasive alternative to liposuction with "no surgery" and "no down time."

32.     ZELTIQ however, fails to adequately warn consumers of and/or intentionally conceals the incidence and occurrence of PAH, a known serious adverse effect where the targeted fat cells increase in number and size (and actually grow larger) after CoolSculpting treatment and form hard, bulging masses under the skin.

33.     PAH is the very opposite of the fat loss results that ZELTIQ represents, promises, and warrants with its CoolSculpting System.

34.     PAH requires invasive, corrective liposuction surgery to remove the masses that form as a result of CoolSculpting treatment.

35.     Moreover, the masses that form as a result of PAH often reoccur even after a patient undergoes the necessary liposuction surgery to have the masses removed from her body.

36.     ZELTIQ knew the risk of PAH associated with use of its CoolSculpting System but failed to adequately warn consumers and intentionally omitted and/or

8

concealed material information about the incidence and occurrence of PAH following

CoolSculpting treatment and/or deemphasized the actual risk of PAH associated with use

of the CoolSculpting System and the fact that invasive surgery would be required to treat any

PAH that develops.

37.     ZELTIQ was aware of the actual incidence and occurrence of PAH, and other

serious, adverse effects, and knew the liability it faced as a result at least as early as March 2013

when it issued its 2012 10-K report to update its investors on its business activity and potential

liability risks. ZELTIQ 2012 10-K, pps. 24, 28.

38.     ZELTIQ was also aware of its exposure – and the liability it faced – as a result of

PAH associated with use of its CoolSculpting System and stated in its 2012 10-K, p. 30:

> We may also be subject to additional liability from claims related to
> **known rare side effects such as late-onset pain, subcutaneous**
> **induration, hernia, and [PAH]**. Product liability claims could
> divert management attention from our core business, be expensive
> to defend, and result in sizable damage awards against us. We
> currently have product liability insurance, but it may not be adequate
> to cover us against potential liability and it may be subject to
> material deductibles.

39.     ZELTIQ went on to note in these SEC filings that "CoolSculpting may cause or

contribute to adverse medical events that we are required to report to the FDA and if we fail to

do so, we could be subject to sanctions that would materially harm our business."

40.     ZELTIQ then reported to the SEC what it never reported in any of its advertising

and/or marketing campaigns directed to consumers, including Ms. Evangelista: "Rare side

effects have been reported after receiving CoolSculpting treatments, such as late-onset pain,

subcutaneous induration, hernia, and **[PAH]**." ZELTIQ 2012 10-K, p. 30 (emphasis added).

41.     ZELTIQ continued to report these "known rare side effects such as late-onset

pain, subcutaneous induration, hernia, and [PAH]" in its subsequent SEC 10-Q and 10-K filings.

However, in November 2016, ZELTIQ's 10-Q updated their products liability

contingency report to state:

> We **have historically been and continue to be predominantly self-insured for any product liability losses related to our products**. We currently have product liability insurance **to limit our exposure to these claims, but this insurance is subject to a cap reimbursement and, may not be adequate to cover us against all potential liability** and is subject to material deductibles. In addition, we may not be able to maintain insurance in amounts or scope sufficient to provide us with adequate coverage against all potential liabilities.[1]

ZELTIQ November 2016 10-Q, p. 16.

42.    Despite its clear knowledge of the incidence and occurrence of PAH after

use of the CoolSculpting System, ZELTIQ failed to inform (or adequately warn)

consumers, including Ms. Evangelista, of the known risk of developing PAH as a result

of using the CoolSculpting System.

43.    ZELTIQ continuously made affirmative representations in its direct-to-

consumer advertising and marketing that the CoolSculpting System should be used by

individuals seeking to avoid liposuction surgery by repeatedly using slogans like:

- "SAY **NO** TO SURGERY;"

- "no surgery, no anesthesia, no downtime;"

- "proven to be a safe and effective treatment for non-surgical fat reduction;" and

- "eliminate stubborn fat without surgery"

44.    ZELTIQ failed to adequately warn and intentionally omitted and/or concealed

material information about the serious health risks and adverse effects, including PAH,

associated with use of its CoolSculpting System and/or the invasive surgeries that may be

---

[1] This change came on the heels of ZELTIQ learning about Ms. Evangelista's injuries and its recommendation that she undergo corrective liposuction surgery with ZELTIQ's Preferred Doctor.

required to correct PAH following treatment, from consumers, including Ms. Evangelista, in its

direct-to-consumer advertising and overall marketing strategies and sales practices.

**ZELTIQ's "Targeted and Strategic" Direct-to-Consumer Advertising and Marketing Pushed Consumers to "Accept No Substitutes for CoolSculpting" to Drive Demand and System Revenue**

45.     In 2012, ZELTIQ launched "targeted and strategic" direct-to-consumer

advertising campaigns, including social media, targeted blogs, television, radio, and print media

to "generate awareness of CoolSculpting among aesthetic veterans and aesthetic neophytes" and

"drive demand for CoolSculpting." ZELTIQ 2011 10-K.

46.     In 2015 "to further enhance and expand…brand awareness," ZELTIQ launched a

second large scale direct-to-consumer advertising campaign with the purpose of "build[ing]

awareness in the marketplace by having consumers (a) go to existing local practices and request

treatment and drive consumable revenue, or (b) go to their local physician who does not yet have

consumable services, create the desire and drive system revenue." ZELTIQ 2015 10-K, p. 4.

47.     ZELTIQ's stated strategy was to drive consumer demand to induce providers to

purchase a CoolSculpting System for use on the consumers who demanded the services. ZELTIQ

2015 10-K.

48.     In its CoolSculpting Consumer FAQ, ZELTIQ explained to CoolSculpting

providers that "ZELTIQ encourages consumers to do their homework and ensure they accept no

substitutes for CoolSculpting."

49.     ZELTIQ's direct-to-consumer marketing and advertising campaigns had the

intended effect: consumers, including Ms. Evangelista, learned about the CoolSculpting System

through ZELTIQ's aggressive direct-to-consumer advertising and marketing campaign and, like

Ms. Evangelista, made a decision, based on the information provided them by ZELTIQ,

to undergo CoolSculpting treatment.

50.     ZELTIQ's website even included a database of CoolSculpting providers

that consumers could search using their city, state, or zip code to locate a provider where

they could obtain CoolSculpting treatments.

51.     ZELTIQ directed and encouraged consumers, including Ms. Evangelista,

to seek out treatment using the CoolSculpting System and "accept no substitutes."

CoolSculpting Consumer FAQ.

52.     ZELTIQ did not advise, encourage, or recommend consumers, including

Ms. Evangelista, to consult with his or her physician or CoolSculpting provider to

determine whether CoolSculpting was the best treatment to achieve the consumer's

weight loss goals based on his or her particular health needs.

**ZELTIQ Engaged in a Massive Direct-to-Consumer Advertising and Marketing Campaign
To Drive Sales and Failed to Warn and/or Intentionally Withheld Material Information
from Consumers about the Risks of PAH Associated with Use of ZELTIQ's CoolSculpting
System**

53.     In ZELTIQ's "Fear No Mirror" direct-to-consumer campaign, in or around

2014 and 2015, ZELTIQ made the following representations to consumers:

- The CoolSculpting procedure shapes what you see without surgery or downtime, so you'll look great from every angle;

- CoolSculpting technology safely delivers precisely controlled cooling to gently and effectively target the fat cells underneath the skin while leaving the skin itself unaffected. The treated fat cells are crystalized (frozen), then die. Over time, your body naturally processes the fat and eliminates these dead cells leaving a more sculpted you. **No surgery, no anesthesia, no downtime.**

- The CoolSculpting procedure is **non-surgical, safe, effective,** and best of all, the **results are long-term**.

12

54.     ZELTIQ's direct-to-consumer television and video ads made similar

representations that CoolSculpting was safe and effective and intentionally omitted any

mention of the incidence and occurrence of PAH following treatment:

- ZELTIQ's 2015 CoolSculpting commercial ended with the text "it's as easy as getting a pedicure," commented that "rare side effects may occur," stated "typical side effects include temporary numbness, discomfort, and swelling," and made no mention of the incidence or occurrence of PAH despite its knowledge of same, https://vimeo.com/126871210;

- ZELTIQ's 2018 CoolSculpting commercial made no mention of any side effect, while again touting results without surgery, https://vimeo.com/283096862;

- ZELTIQ's 2020 CoolSculpting commercial warned that rare side effects may occur, but does not mention the incidence or occurrence of PAH or that surgical correction is required, https://www.ispot.tv/ad/ZJZN/coolsculpting-you-crush-hills; and

- the video that ZELTIQ prepared and posted to its Vimeo webpage celebrating its receipt of a NEWBEAUTY AWARD represents "NO SURGERY NO DOWNTIME" and does not indicate any incidence or occurrence of adverse effects, like PAH, https://player.vimeo.com/video/238677979.Xzz

55.     ZELTIQ also maintained a Facebook page where it interacted with consumers

directly and made similar representations that CoolSculpting was safe and effective and

intentionally omitted any mention of the incidence and occurrence of PAH following treatment:

- A July 29, 2015 post by ZELTIQ contains a patient testimonial that they were "SO GLAD THAT [THEY] TRIED THE COOLSCULPTING PROCEDURE BEFORE CONSIDERING A TUMMY TUCK OR LIPO. SURGERY AND THE RECOVERY TIME WOULD HAVE PUT ME OUT MONTHS, WHICH I COULD NEVER DO WITH WORK AND KIDS" with ZELTIQ's explanation that "the CoolSculpting procedure is perfect for those on-the-go because there is no surgery and no downtime!"; and

- A September 28, 2015 post by ZELTIQ represents that "with no downtime, Molly [Sims] can continue her job as a mom and supermodel post-procedure!"

56.     ZELTIQ's direct-to-consumer advertising, marketing, promotion, and/or sales

practices misrepresents to consumers, including Ms. Evangelista, that the CoolSculpting System

13

is safe and effective for its intended use and omits material information by failing to disclose known health risks, including the incidence and occurrence of PAH following treatment.

57.     ZELTIQ's direct-to-consumer advertising was successful and ZELTIQ reported in its 2015 10-K, p.15, that "CoolSculpting website traffic significantly increased in those markets, and local CoolSculpting providers experienced a significant increase in patient interest and treatments."

58.     As a result of ZELTIQ's failure to warn of the known health risks and serious adverse effects associated with use of its CoolSculpting System in ZELTIQ's advertisements and marketing materials, those persons who used it, including Ms. Evangelista, have suffered and may continue to suffer severe and permanent personal injuries, including, but not limited to, PAH.

**Ms. Evangelista**

59.     Linda Evangelista is an original '90s era Supermodel and is one of the most recognizable and photographed women in the world.

60.     Ms. Evangelista began her modeling career in New York in 1984 and quickly became one of the most successful and sought-after models in the world.

61.     Ms. Evangelista enjoyed a wildly successful and lucrative modeling career from 1984 through 2016, until she was permanently injured and disfigured by ZELTIQ's CoolSculpting System.

62.     Ms. Evangelista's career has spanned over 30 years and she remains in high demand to appear on the covers of magazines, serve as the face of advertising

campaigns and new products, and walk the runway along with the other Original Supermodels in iconic fashion shows.

63.     However, because of the physical injuries and permanent disfigurement that she suffered as a result of using ZELTIQ's CoolSculpting System, Ms. Evangelista cannot accept or even explore these opportunities and prior to this lawsuit she endeavored to keep her physical injuries and disfigurement private.

**Ms. Evangelista's CoolSculpting Treatments and Resulting PAH**

64.     Ms. Evangelista learned about the CoolSculpting System from ZELTIQ's direct-to-consumer advertisements, ZELTIQ's promotional materials, and socially among her friends.

65.     None of the advertisements or promotional materials that Ms. Evangelista consulted adequately warned of (and in some instances wholly omitted) the incidence, occurrence, or likelihood of developing PAH following treatment.

66.     Nor did the advertisements or promotional materials warn that invasive, corrective liposuction surgery was the only treatment for PAH, that PAH may recur even after surgery, or that the resulting growths would be permanent and disfiguring.

67.     Had ZELTIQ properly disclosed and adequately warned consumers, including Ms. Evangelista, of the known health risks and serious adverse effects associated with use of the CoolSculpting System, including the incidence and occurrence of PAH following treatment, in its aggressive direct-to-consumer advertising campaign and its promotional and marketing materials, Ms. Evangelista would not have pursued, chosen, or undergone CoolSculpting treatment.

68.      Ms. Evangelista chose ZELTIQ's CoolSculpting System and elected to undergo CoolSculpting treatment based on ZELTIQ's representations that CoolSculpting was a safe and

effective, non-invasive alternative to liposuction surgery for contouring small areas of the body, and Ms. Evangelista underwent CoolSculpting treatment for that purpose.

69.     Unaware of the health risks and serious adverse effects associated with use of the CoolSculpting System, including, but not limited to, the incidence and occurrence of PAH following treatment, Ms. Evangelista approached her dermatologist, Karyn Grossman, M.D. ("Dr. Grossman"), and specifically requested treatment using the CoolSculpting System.

70.     Ms. Evangelista was in good physical shape and at a healthy weight and body mass index prior to using ZELTIQ's CoolSculpting System.

71.     Ms. Evangelista pursued CoolSculpting treatment in hopes of contouring small areas of her body as ZELTIQ represented and promised in its direct-to-consumer advertising and marketing and promotional materials detailed herein.

72.     Beginning in August 2015 through February 2016, Ms. Evangelista underwent seven treatments using the ZELTIQ CoolSculpting System for the intended purpose of breaking down fat cells in her abdomen, flanks, back and bra area, inner thighs, and chin.

73.     On or about August 8, 2015, Dr. Grossman provided Ms. Evangelista with a Request for and Consent for ZELTIQ/CoolSculpting Procedure (the "Grossman Consent Form").

74.     The Grossman Consent Form failed to provide information that would allow an individual to make a meaningful assessment of the risks of PAH in order to make an informed decision regarding the procedure.

75.     Specifically, the Grossman Consent form fails to even identify PAH as a risk and fails to disclose: (i) the number of incidents of paradoxical adipose hyperplasia; (ii) the

likelihood of PAH occurring; (iii) the type of corrective surgery that may be required; (iv) the

risks of that surgery, and (v) the likelihood that the corrective surgery would be successful.

76.     Instead, the Grossman Consent Form simply states that "it is unlikely but there is

a small possibility of indentation at the site of treatment. It is also unlikely but there is a small

possibility of fat growing instead of going away. There are a very small number of reports of

both of these but they may require surgical correction."

77.     On or about August 8, 2015, Ms. Evangelista underwent treatment using

ZELTIQ's CoolSculpting System on her abdomen and flanks for the intended purpose of

breaking down fat cells in those areas.

78.     On or about October 1, 2015, Ms. Evangelista underwent treatment using

ZELTIQ's CoolSculpting System on her flanks and back fat for the intended purpose of breaking

down fat cells in those areas.

79.     On or about December 11, 2015, Ms. Evangelista underwent treatment using

ZELTIQ's CoolSculpting System on her abdomen for the intended purpose of breaking down fat

cells in that area.

80.     On or about December 12, 2015, Ms. Evangelista underwent treatment using

ZELTIQ's CoolSculpting System on her flanks for the intended purpose of breaking down fat

cells in those areas.

81.     On or about February 18, 2016, Ms. Evangelista underwent treatment using

ZELTIQ's CoolSculpting System on her inner thighs for the intended purpose of breaking down

fat cells in those areas.

82.    On or about February 19, 2016, Ms. Evangelista underwent treatment using ZELTIQ's CoolSculpting System on her bra fat and abdomen for the intended purpose of breaking down fat cells in those areas.

83.    On or about February 20, 2016, Ms. Evangelista underwent treatment using ZELTIQ's CoolSculpting System on her chin for the intended purpose of breaking down fat cells in that area.

84.    Dr. Grossman used ZELTQ's CoolSculpting System on Ms. Evangelista in a reasonable and foreseeable manner and pursuant to the instructions for use accompanying the CoolSculpting System.

85.    Following the final round of CoolSculpting treatments, Ms. Evangelista noticed that the areas treated with the CoolSculpting System were getting larger not smaller as they had after her previous CoolSculpting treatments.

86.    Ms. Evangelista was unaware that PAH was an adverse effect associated with use of the CoolSculpting System.

87.    Within a few months, Ms. Evangelista developed hard, bulging, painful masses under her skin in those areas of her body treated with ZELTIQ's CoolSculpting System.

88.    In or around June 2016, Ms. Evangelista was diagnosed with PAH.

**ZELTIQ Directed Ms. Evangelista To Undergo "Corrective" Liposuction Surgery Resulting in Additional Pain and Keloid Scarring and Reneged on its Promise To Pay the Cost of Surgery**

89.    Ms. Evangelista reported her adverse reaction to ZELTIQ and ZELTIQ arranged for Ms. Evangelista to undergo an intensive corrective liposuction surgery with

one of several plastic surgeons who ZELTIQ uses to treat individuals who develop PAH following treatment using the CoolSculpting System ("ZELTIQ's Preferred Doctor").

90.     ZELTIQ's Preferred Doctor examined Ms. Evangelista and noted that she was sent to him by ZELTIQ to correct the increased fat and that she suffered from "significant areas of fatty hyperplasia."

91.     ZELTIQ represented to Ms. Evangelista that it would cover the cost of her corrective liposuction surgery and Ms. Evangelista relied upon that representation when she consulted and scheduled corrective liposuction surgery with ZELTIQ's Preferred Doctor.

92.     However, on the eve of Ms. Evangelista's surgery, ZELTIQ conditioned that payment on Ms. Evangelista agreeing to execute a Confidentiality Agreement and Release whereby Ms. Evangelista would agree to release ZELTIQ from any and all claims and to keep the terms of the Agreement and Release confidential.

93.     ZELTIQ knew that Ms. Evangelista was bound by hospital policy and/or ZELTIQ's Preferred Doctor and financially obligated to cover the cost of her surgery when it attempted to force her into signing a Confidentiality Agreement and Release less than 24 hours before the scheduled surgery.

94.     Ms. Evangelista refused to sign the Confidentiality Agreement and Release and ZELTIQ refused to pay for Ms. Evangelista's corrective liposuction surgery.

95.     Ms. Evangelista consulted and scheduled liposuction surgery with ZELTIQ's Preferred Doctor at ZELTIQ's direction and on reliance on ZELTIQ's promise that it would cover the cost of the surgery.

96.     Ms. Evangelista was unable to cancel her surgery and financially obligated to cover the cost of the surgery when ZELTIQ reneged on its promise to pay for Ms. Evangelista's liposuction surgery at the eleventh hour.

97.     On July 22, 2016, Ms. Evangelista underwent intensive corrective liposuction surgery performed by ZELTIQ's Preferred Doctor, as ZELTIQ directed to remove the fat growths.

98.     In contemporaneous notes, ZELTIQ's Preferred Doctor identified several "significant areas of fatty hyperplasia" and explained that "ZELTIQ sent patient to [ZELTIQ's Preferred Doctor] to have increased fat corrected with liposuction."

99.     The corrective surgery involved full body liposuction with a lengthy and painful recovery.

100.    Ms. Evangelista was required to wear compression garments for a period of several months after surgery and was unable to work or book future work during her recovery.

101.    To date, ZELTIQ has not reimbursed Ms. Evangelista for any of the costs or expenses associated with the "corrective" surgery.

102.    The "corrective" surgery performed by ZELTIQ's Preferred Doctor was unsuccessful and the fatty hyperplasia returned to the areas where the CoolSculpting System was applied to Ms. Evangelista.

103.    In July of 2017, Ms. Evangelista underwent a second intense corrective liposuction surgery on those areas suffering PAH that also involved a lengthy and painful recovery.

104.    The second "corrective" surgery also proved unsuccessful, and the fatty hyperplasia returned to those areas of Ms. Evangelista's body where ZELTIQ's CoolSculpting System was applied.

105.    The two "corrective" surgeries were not only unsuccessful in removing the fatty hyperplasia from Ms. Evangelista's body, but also resulted in immense keloid scarring.

106.    Had ZELTIQ properly disclosed and adequately warned consumers of the known health risks and serious adverse effects associated with use of the CoolSculpting System, including the incidence and occurrence of PAH following treatment, in its aggressive direct-to-consumer advertising campaign and its promotional and marketing materials, Ms. Evangelista would not have chosen to undergo any treatment using the CoolSculpting System.

**Ms. Evangelista's Resulting Permanent Physical Injuries, Disfigurement, Severe Emotional Distress, Mental Anguish, and Financial Losses**

107.    Ms. Evangelista suffered permanent physical injuries as a direct and proximate result of using ZELTIQ's CoolSculpting System and multiple, invasive procedures and surgeries required to try to correct those physical injuries as directed by ZELTIQ.

108.    Ms. Evangelista's physical injuries are permanent and disfiguring and prevent her from continuing her modeling career.

109.    Ms. Evangelista is unemployable as a model and has not earned any income from modeling since 2016 (with the exception of one royalty payment in 2017 from a prior Moschino perfume campaign).

110.    Ms. Evangelista continues to experience severe pain and suffering, emotional distress, mental anguish, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a result of using ZELTIQ's CoolSculpting System

and multiple, invasive procedures and surgeries required to try to correct those physical injuries as directed by ZELTIQ.

111.    Ms. Evangelista remains permanently injured as a direct and proximate result of using ZELTIQ's CoolSculpting System despite undergoing several surgeries and procedures to correct the physical injuries caused by ZELTIQ's CoolSculpting System and detailed herein.

112.    The invasive liposuction surgeries that Ms. Evangelista underwent at ZELTIQ's direction to correct her PAH further exacerbated her physical injuries and caused immense keloid scarring.

113.    Ms. Evangelista's body remains permanently disfigured as a result of the physical injuries that she suffered as a result of using ZELTIQ's CoolSculpting System and the multiple, invasive procedures and surgeries that she underwent at ZELTIQ's direction to try to correct those injuries.

114.    Ms. Evangelista has suffered severe financial losses due to the permanent and disfiguring physical injuries that she suffered as a result of using ZELTIQ's CoolSculpting System as well as her need for multiple, invasive surgeries and procedures that she underwent at ZELTIQ's direction to try to correct the physical injuries caused by ZELTIQ's CoolSculpting System.

115.    Ms. Evangelista has suffered severe financial losses due to her inability to work and disfigurement resulting from the physical injuries she suffered as a result of using ZELTIQ's CoolSculpting System.

116.   Ms. Evangelista has suffered severe reputational and branding losses due to the media's scrutiny of the physical injuries and disfigurement that she suffered as a result of using ZELTIQ's CoolSculpting System.

117.   Ms. Evangelista has suffered severe reputational and branding losses due to the agoraphobia that she developed as a result of the physical injuries and disfigurement that she suffered as a result of using ZELTIQ's CoolSculpting System.

118.   Ms. Evangelista has been forced to decline significant modelling engagements, including, but not limited to, walking the runway during fashion week with the other Original Supermodels for Versace in September 2017 and walking the runway with the other Original Supermodels during a Dolce & Gabbana show due to the physical injuries and disfigurement that she suffered as a result of using ZELTIQ's CoolSculpting and the multiple, invasive procedures and surgeries that she underwent at ZELTIQ's direction to try to correct those injuries.

119.   Ms. Evangelista has suffered severe financial losses due to her inability to promote her own business ventures due to the physical injuries and disfigurement that she suffered as a result of using ZELTIQ's CoolSculpting System and the multiple, invasive procedures and surgeries that she underwent at ZELTIQ's direction to try to correct those injuries.

120.   In 2016, Ms. Evangelista joined Erasa Skincare ("Erasa") as Vice President and Creative Director, ERASA XEP-30, but was forced to cease all public appearances due to the physical injuries and permanent disfigurement that she suffered as a result of using the CoolSculpting System and lost both her monthly consulting fee and all projected net income.

121.   Ms. Evangelista has suffered severe emotional distress and mental anguish as a result of the physical injuries and disfigurement that she suffered as a result of using ZELTIQ's

CoolSculpting System and the multiple, invasive procedures and surgeries that she underwent at ZELTIQ's direction to try to correct those injuries.

122.   Ms. Evangelista has developed severe social anxiety and agoraphobia as a result of the physical injuries and disfigurement that she suffered as a result of using ZELTIQ's CoolSculpting System and the multiple, invasive procedures and surgeries that she underwent at ZELTIQ's direction to try to correct those injuries.

123.   Had ZELTIQ properly disclosed and adequately warned consumers of the known health risks and serious adverse effects associated with use of its CoolSculpting System, including, but not limited to, the incidence and occurrence of PAH following treatment, in its aggressive direct-to-consumer advertising campaign and its promotional and marketing materials, Ms. Evangelista would not have undergone any treatment using the CoolSculpting System.

124.   Had Ms. Evangelista known the true facts with respect to the dangerous and serious health risks associated with use of ZELTIQ's CoolSculpting System, Ms. Evangelista would not have purchased, used and/or relied on the CoolSculpting System.

125.   Ms. Evangelista seeks compensatory damages for past and future damages, including, but not limited to, pain and suffering associated with her severe and permanent personal injuries, healthcare and medical costs, medical monitoring, and lost business opportunities; punitive and exemplary damages for ZELTIQ's wanton, willful, and reckless disregard for the safety and welfare of consumers, including Ms. Evangelista, in an amount sufficient to punish ZELTIQ and deter future similar conduct; and attorneys' fees and costs.

## FIRST CAUSE OF ACTION
### (Strict Products Liability)

126.     Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1 through 125 above as if set forth at length herein.

127.   At all times herein mentioned, ZELTIQ created, designed, developed, manufactured, distributed, labeled, advertised, marketed, promoted, and/or sold its CoolSculpting System to be used in the manner described herein to be used on individuals to induce lipolysis, *i.e.,* the breaking down of fat cells in the body, and its CoolSculpting System was used on Ms. Evangelista for that purpose.

128.   At all times mentioned herein, ZELTIQ marketed, promoted, advertised, and sold its CoolSculpting System directly to consumers as a safe and effective, non-invasive alternative to liposuction.

129.   ZELTIQ failed to adequately warn consumers of and/or intentionally concealed material information concerning known serious adverse effects, including, but not limited to, the incidence and occurrence of PAH following use of the CoolSculpting System.

130.   ZELTIQ's direct-to-consumer advertising, marketing, promotion, and/or sales practices misrepresented to consumers, including Ms. Evangelista, that the CoolSculpting System was safe and effective for its intended use and intentionally omitted material information by failing to disclose known health risks and serious adverse effects, including, but not limited to, the incidence and occurrence of PAH following treatment, the need for invasive liposuction surgery to correct PAH, the lengthy and painful recovery following surgery, the likelihood of success, and the risk of permanent bodily injury and disfigurement as a result.

131.   ZELTIQ knew the risk of PAH associated with use of its CoolSculpting System, but failed to adequately warn consumers and intentionally omitted material information about the

25

incidence and occurrence of PAH following CoolSculpting and/or deemphasized the actual risk of PAH associated with the CoolSculpting System and the fact that invasive liposuction surgery would be required to treat any PAH that develops.

132.   As manufacturer of the CoolSculpting System, ZELTIQ had a duty to warn of all known health risks and adverse effects associated with use of the CoolSculpting System, particularly the incidence and occurrence of PAH.

133.   ZELTIQ's CoolSculpting System was expected to and did reach the usual and intended consumers, including Ms. Evangelista, without substantial change in the condition in which it was created, designed, developed, manufactured, distributed, labeled, advertised, marketed, promoted, produced, and/or sold by ZELTIQ.

134.   Ms. Evangelista used ZELTIQ's CoolSculpting System for the purpose and in the manner for which it was intended.

135.   ZELTIQ's CoolSculpting System was defective due to inadequate warnings as ZELTIQ knew or should have known that its CoolSculpting System created a risk of serious and dangerous adverse effects, including, but not limited to, PAH and/or other severe and permanent physical injuries.

136.   ZELTIQ's CoolSculpting System was defective due to inadequate warnings because after ZELTIQ knew or should have known of those risks of serious adverse effects, including, but not limited to, PAH and/or other severe and permanent physical injuries, ZELTIQ continued to improperly advertise, market and/or promote its CoolSculpting System directly to consumers, including Ms. Evangelista.

137.   Ms. Evangelista has suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of using the CoolSculpting System and

ZELTIQ's failure to warn of known serious health risks and adverse effects, including, but not limited to, PAH following use of the CoolSculpting System.

138.   Ms. Evangelista continues to experience serious and dangerous adverse effects, including, but not limited to, PAH as well as other severe and personal injuries that are permanent and lasting in nature, severe physical pain and suffering, emotional distress, mental anguish, diminished enjoyment of life, medical expenses, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a direct and proximate result of using ZELTIQ's CoolSculpting System.

139.   Ms. Evangelista further requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Ms. Evangelista is informed and believes and further alleges that she will in the future be required to obtain further medical and/or hospital care, attention, and services.

140.   Had ZELTIQ properly disclosed and adequately warned consumers, including Ms. Evangelista, of the known health risks and serious adverse effects associated with use of its CoolSculpting System, including the incidence and occurrence of PAH following treatment, in its aggressive direct-to-consumer advertising campaign and its promotional and marketing materials, Ms. Evangelista would not have undergone any treatment using the CoolSculpting System.

141.   ZELTIQ acted willfully, wantonly, and with reckless disregard for the health, safety, and well-being of consumers, including Ms. Evangelista.

142.   ZELTIQ is therefore strictly liable in tort to Ms. Evangelista for designing, developing, manufacturing, marketing, distributing, advertising, promoting, and/or selling a defective product in the form of its CoolSculpting System.

143.    By reason of the foregoing, Ms. Evangelista has been damaged as against

ZELTIQ in the sum of fifty million dollars ($50,000,000.00).

**SECOND CAUSE OF ACTION**
**(Negligence)**

144.    Ms. Evangelista incorporates by reference the allegations set forth in

paragraphs 1 through 143 above as if set forth at length herein.

145.    As manufacturer of the CoolSculpting System, ZELTIQ knew or should

have known that its CoolSculpting System placed users at risk for developing serious and

dangerous adverse effects, including, but not limited to, PAH and other severe and

personal injuries which are permanent and lasting in nature.

146.    As manufacturer of the CoolSculpting System, ZELTIQ had a duty to

exercise reasonable care in creating, designing, developing, manufacturing, labeling,

packaging, advertising, marketing, promoting, distributing and/or selling its

CoolSculpting System into the stream of commerce, including a duty to warn consumers

of known, dangerous adverse effects, like PAH.

147.    ZELTIQ breached that duty by failing to adequately warn consumers,

including Ms. Evangelista, of the incidence and occurrence of the known, serious adverse

effect PAH following use of the CoolSculpting System, the need for invasive corrective

liposuction surgery to correct PAH, the lengthy and painful recovery post-surgery, the

(un)likelihood of success, and the risk of permanent physical injury and bodily

disfigurement as a result.

148.    ZELTIQ negligently represented that its CoolSculpting System was safe

and effective for use for its intended purpose, when, in fact, it was unsafe and posed

serious health risks and adverse effects, including, but not limited to, PAH.

149.    ZELTIQ negligently failed to adequately and correctly warn Ms. Evangelista and other consumers of the inherent dangers of its CoolSculpting System, including, but not limited to, known serious health risks and adverse effects, including the incidence and occurrence of PAH, in its direct-to-consumer marketing and advertising.

150.    ZELTIQ negligently and improperly concealed from and/or misrepresented material information to consumers, including Ms. Evangelista concerning the severity of those health risks, inherent dangers, and serious adverse effects, including, but not limited to, PAH, associated with use of its CoolSculpting System.

151.    ZELTIQ negligently failed to accompany its product with proper warnings regarding all possible adverse effects, including, but not limited to, the incidence and occurrence of PAH associated with the use of its CoolSculpting System.

152.    ZELTIQ negligently failed to warn consumers, including Ms. Evangelista, of the severity and duration of all possible adverse effects, including, but not limited to, the incidence and occurrence of PAH as the warnings provided were inadequate and did not accurately reflect the symptoms or severity of the adverse effects.

153.    Despite the fact that ZELTIQ knew or should have known that its CoolSculpting System caused unreasonably dangerous and serious adverse effects, including, but not limited to, the incidence and occurrence of PAH, and continued to advertise, market, promote, distribute and/or sell its CoolSculpting System directly to consumers, including to Ms. Evangelista.

154.    ZELTIQ had a duty to warn of all known serious adverse effects, including, but not limited to, the incidence and occurrence of PAH following use of its CoolSculpting System but failed to do so.

155.   ZELTIQ knew or should have known that consumers, including Ms. Evangelista, would foreseeably suffer injury, and/or be at increased risk of suffering injury, as a result of ZELTIQ's failure to exercise ordinary care and adequately warn of all known serious adverse effects, including, but not limited to, the incidence and occurrence of PAH.

156.   Ms. Evangelista has suffered severe and permanent physical injuries and bodily disfigurement as a direct and proximate result of ZELTIQ's negligence and failure to warn of all known serious adverse effects, including, but not limited to, the incidence and occurrence of PAH, and other actions described herein.

157.   Had ZELTIQ properly disclosed and adequately warned consumers of the known health risks and serious adverse effects associated with use of its CoolSculpting System, including the incidence and occurrence of PAH following treatment, in its aggressive direct-to-consumer advertising campaign and its promotional and marketing materials, Ms. Evangelista would not have undergone any treatment using the CoolSculpting System.

158.   Ms. Evangelista continues to experience serious and dangerous adverse effects, including, but not limited to, PAH as well as other severe and personal injuries that are permanent and lasting in nature, severe physical pain and suffering, emotional distress, mental anguish, diminished enjoyment of life, medical expenses, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a direct and proximate result of using ZELTIQ's CoolSculpting System.

159.   Ms. Evangelista further requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Ms. Evangelista is

informed and believes and further alleges that Ms. Evangelista will in the future be required to

obtain further medical and/or hospital care, attention, and services.

160.    By reason of the foregoing, Ms. Evangelista has been damaged as against

ZELTIQ in the sum of fifty million dollars ($50,000,000.00).

### THIRD CAUSE OF ACTION
### (Breach of Express Warranty)

161.    Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1

through 160 above as if set forth at length herein.

162.    ZELTIQ expressly warrants, *inter alia,* that its CoolSculpting System is safe and

effective, and promises: "No surgery. No downtime. Unmistakable results."

163.    ZELTIQ made these and other express warranties, including, but not limited to,

those detailed herein, to induce consumers, like Ms. Evangelista, to purchase CoolSculpting.

164.    ZELTIQ engaged in a "targeted and strategic" direct-to-consumer advertising

campaign, including social media, targeted blogs, television, radio, and print media to "generate

awareness of CoolSculpting" and "drive demand for CoolSculpting."

165.    Ms. Evangelista relied on ZELTIQ's express warranties of safety and efficacy to

her physical and economic detriment.

166.    Ms. Evangelista was promised a more contoured appearance; instead, the target

fat cells actually increased in number and size and formed hard, bulging masses under her skin.

167.    Ms. Evangelista was promised "No Surgery. No Downtime"; instead, she was

forced to undergo costly and painful invasive liposuction surgeries at ZELTIQ's direction in an

attempt to remove the fat growths in those areas of her body where ZELTIQ's CoolSculpting

System was applied. The corrective surgeries involved full body liposuction with a lengthy and

painful recovery that included extended downtime. Ms. Evangelista was required to wear

compression garments for a period of several months after surgery and was unable to work or book future work during that time.

168.    ZELTIQ touted its CoolSculpting System as a safe and effective alternative to liposuction, and failed to warn consumers of the serious, adverse effect PAH to induce consumers, like Ms. Evangelista, to purchase its CoolSculpting System.

169.    ZELTIQ launched its direct-to-consumer ad campaign "to further enhance and expand…brand awareness" throughout the United States and in select targeted cities in North America and Europe. ZELTIQ 2015 10-K.

170.    ZELTIQ's stated purpose in launching its direct-to-consumer campaign was to "build[] awareness in the marketplace by having consumers (a) go to existing local practices and request treatment and drive consumable revenue, or (b) go to their local physician who does not yet have consumable services, create the desire and drive consumer revenue." ZELTIQ 2015 10-K.

171.    ZELTIQ further represented to consumers, including Ms. Evangelista, that the CoolSculpting System did  not produce any serious health risks or dangerous adverse effects and that the adverse effects it did produce were accurately reflected in its warnings.

172.    ZELTIQ breached these and similar express warranties in that ZELTIQ's CoolSculpting System did not conform to its express representations as it was not safe and effective and posed serious health risks and dangerous adverse effects, including, but not limited to, PAH, which requires invasive liposuction surgery with a painful and lengthy recovery to correct.

173.    ZELTIQ knew that the representations and warranties described herein were false, misleading and untrue and that its CoolSculpting System was not safe and fit for the use intended, and, in fact, produced serious adverse effects, including, but not limited to, PAH, causing injuries to consumers, including Ms. Evangelista, that were not accurately identified and reported by ZELTIQ.

174.   Ms. Evangelista has suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of ZELTIQ's actions described herein.

175.   Ms. Evangelista continues to experience serious and dangerous adverse effects, including, but not limited to, PAH as well as other severe and personal injuries that are permanent and lasting in nature, severe physical pain and suffering, emotional distress, mental anguish, diminished enjoyment of life, medical expenses, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a direct and proximate result of using ZELTIQ's CoolSculpting System.

176.    Ms. Evangelista further requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Ms. Evangelista is informed and believes and further alleges that Ms. Evangelista will in the future be required to obtain further medical and/or hospital care, attention, and services.

177.   By reason of the foregoing, Ms. Evangelista has been damaged as against ZELTIQ in the sum of fifty million dollars ($50,000,000.00).

## FOURTH CAUSE OF ACTION
### (Breach of Implied Warranties)

178.    Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1 through 177 above as if set forth at length herein.

179.   ZELTIQ created, designed, developed, manufactured, distributed, labeled, advertised, marketed, promoted, and/or sold its CoolSculpting System to be used on individuals to induce lipolysis.

180.   At the time ZELTIQ advertised, marketed, promoted, sold, and/or distributed its CoolSculpting System for use by consumers, including Ms. Evangelista, ZELTIQ knew of the use for which its CoolSculpting System was intended and impliedly warranted the CoolSculpting System was safe, of merchantable quality, and fit for the ordinary purpose for which the CoolSculpting System was to be used.

181.   ZELTIQ's representations and warranties were false, misleading, and inaccurate in that ZELTIQ's CoolSculpting System posed a serious risk of adverse effects, including, but not limited to, PAH, and therefore was unsafe, unreasonably dangerous, improper, not of merchantable quality, not fit for the its intended use, and/or defective.

182.   Ms. Evangelista reasonably relied on these implied warranties of merchantability and fitness for a particular use and purpose.

183.   Ms. Evangelista reasonably relied upon the skill and judgment of ZELTIQ to determine and advise whether its CoolSculpting System was of merchantable quality and safe and fit for its intended use.

184.   Ms. Evangelista used the CoolSculpting System in the customary, usual, and reasonably foreseeable manner.

185.   ZELTIQ's CoolSculpting System was injected into the stream of commerce by ZELTIQ in a defective, unsafe, and inherently dangerous condition and reached consumers without substantial change in the condition in which it was sold.

186.   ZELTIQ breached its implied warranties as its CoolSculpting System was neither merchantable nor fit for its intended purpose and use.

187.   Ms. Evangelista has suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of ZELTIQ's actions described herein.

188.   Ms. Evangelista continues to experience serious and dangerous adverse effects, including, but not limited to, PAH as well as other severe and personal injuries that are permanent and lasting in nature, severe physical pain and suffering, emotional distress, mental anguish, diminished enjoyment of life, medical expenses, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a direct and proximate result of using ZELTIQ's CoolSculpting System.

189.   Ms. Evangelista further requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Ms. Evangelista is informed and believes and further alleges that Ms. Evangelista will in the future be required to obtain further medical and/or hospital care, attention, and services.

190.   By reason of the foregoing, Ms. Evangelista has been damaged as against ZELTIQ in the sum of fifty million dollars ($50,000,000.00).

**FIFTH CAUSE OF ACTION**
**(Fraudulent Misrepresentation)**

191.   Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1 through 190 above as if set forth at length herein.

192.   ZELTIQ falsely and fraudulently misrepresented the safety and efficacy of the CoolSculpting System to consumers, including Ms. Evangelista, and intentionally omitted and concealed the incidence and occurrence of PAH, a known serious adverse effect, with the

intention that consumers, including Ms. Evangelista, would purchase the CoolSculpting System thereby driving ZELTIQ's "consumable revenue."

193.    ZELTIQ knew that PAH was a serious, adverse effect of CoolSculpting, and intentionally misrepresented to consumers, including Ms. Evangelista, that the CoolSculpting System was safe and effective for its intended use and intentionally omitted material information by failing to disclose known health risks, including the incidence and occurrence of PAH following treatment, the need for invasive liposuction surgery to correct PAH, the lengthy and painful recovery, the likelihood of success, and the risk of permanent bodily injury and disfigurement as a result.

194.    ZELTIQ represented that its CoolSculpting System was "safe" and "effective" and required "no surgery or downtime, so you're in and out of the office like always."

195.    ZELTIQ marketed and advertised CoolSculpting as "safely deliver[ing] precisely controlled cooling to gently and effectively target the fat cells underneath the skin while leaving the skin itself unaffected."

196.    The ZELTIQ *Fear No Mirror* campaign, detailed *supra*, boasted "[n]o surgery, no anesthesia, no downtime" and everywhere characterized CoolSculpting as "non-surgical, safe, effective."

197.    ZELTIQ's television and video ads made similar representations that CoolSculpting was safe and effective, made no mention of PAH, and intentionally omitted any information regarding the incidence and occurrence of PAH after and as a result of using the CoolSculpting System.

198.   ZELTIQ knew that PAH was a serious, adverse effect of CoolSculpting and knew the liability it faced as a result, but intentionally and with reckless disregard for the health and safety of consumers, like Ms. Evangelista, failed to warn of known serious adverse effects, including, but not limited to, PAH following treatment to further its bottom line.

199.   Ms. Evangelista relied on ZELTIQ's representations that the CoolSculpting System was safe and effective – a quick and easy alternative to liposuction with minimal risk that required no surgery or downtime – and purchased seven CoolSculpting treatments to achieve the promise of a more-contoured appearance in her abdomen, flanks, back and bra area, inner thighs, and chin.

200.   ZELTIQ knew these representations to be false, misrepresented the safety and efficacy of CoolSculpting and intentionally concealed the risk of PAH associated with CoolSculpting to "drive consumable revenue," and induce consumers, including Ms. Evangelista to purchase treatments using the CoolSculpting System.

201.   At the time she used ZELTIQ's CoolSculpting System, Ms. Evangelista was unaware of the falsity of ZELTIQ's representations and reasonably believed them to be true.

202.   Ms. Evangelista developed PAH as a direct and proximate result of using the CoolSculpting System, and underwent multiple, costly, invasive, corrective liposuction surgeries at ZELTIQ's direction in an attempt to correct the PAH.

203.   Ms. Evangelista has suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of ZELTIQ's actions described herein.

204.   Had Ms. Evangelista not been misled about the risks associated with CoolSculpting, and about PAH in particular, she would not have used the CoolSculpting System.

205.   These representations were made by ZELTIQ with the intent of defrauding and deceiving consumers, including Ms. Evangelista, and inducing them to purchase and/or use its CoolSculpting System.

206.    ZELTIQ acted willfully, wantonly, and with reckless disregard for the health, safety and well-being of consumers, including Ms. Evangelista.

207.   Ms. Evangelista suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of ZELTIQ's actions described herein.

208.   Ms. Evangelista continues to experience serious and dangerous adverse effects, including, but not limited to, PAH as well as other severe and personal injuries that are permanent and lasting in nature, severe physical pain and suffering, emotional distress, mental anguish, diminished enjoyment of life, medical expenses, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a direct and proximate result of using ZELTIQ's CoolSculpting System.

209.    Ms. Evangelista further requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Ms. Evangelista is informed and believes and further alleges that Ms. Evangelista will in the future be required to obtain further medical and/or hospital care, attention, and services.

210.    By reason of the foregoing, Ms. Evangelista has been damaged as against ZELTIQ in the sum of fifty million dollars ($50,000,000.00).

**SIXTH CAUSE OF ACTION**
**(Fraudulent Concealment)**

211.    Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1 through 210 above as if set forth at length herein.

212.     As manufacturer of the CoolSculpting System, ZELTIQ had superior knowledge of all risks associated with CoolSculpting, including the incidence and occurrence of PAH as well as the need for invasive liposuction surgery to correct PAH, the extended recovery period following corrective surgery, and the success rate of that surgery.

213.     ZELTIQ had sole access to material facts concerning the defective nature of the CoolSculpting System and its propensity to cause serious and dangerous adverse effects and cause injury and damage to persons who used it, including Ms. Evangelista in particular.

214.     As manufacturer of the CoolSculpting System, ZELTIQ had a duty to disclose all known, adverse effects of CoolSculpting, including PAH, and adequately warn consumers, like Ms. Evangelista, of the incidence and occurrence of PAH and all known adverse effects.

215.     ZELTIQ knew that PAH was a serious, adverse effect of CoolSculpting, and, as detailed *supra*, knew the potential liability it faced as a result.

216.     ZELTIQ not only failed to discharge its duty to warn Ms. Evangelista, and consumers like her, of the incidence and occurrence of PAH, but fraudulently concealed and intentionally omitted those facts in its marketing materials and advertising.

217.     ZELTIQ fraudulently concealed and intentionally omitted material information concerning the serious health risks and dangerous adverse effects associated with use of its CoolSculpting System, including, but not limited to, PAH as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish.

218.     ZELTIQ's concealment and omissions of material information concerning, *inter alia*, the serious health risks and adverse effects associated with the CoolSculpting System was done purposely, willfully, wantonly, and with reckless disregard for Ms. Evangelista, and others

like her, to further its bottom line, "drive consumable revenue," and cause them to purchase, recommend, and/or use its CoolSculpting System.

219.    ZELTIQ knew that Ms. Evangelista, and others like her, had no way to determine the truth behind ZELTIQ's fraudulent concealment and material omissions concerning its CoolSculpting System as set forth herein.

220.    Ms. Evangelista relied on ZELTIQ's fraudulent concealment and material omissions in choosing, purchasing, and using the CoolSculpting System.

221.   Ms. Evangelista suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of ZELTIQ's actions described herein.

222.   Ms. Evangelista continues to experience serious and dangerous adverse effects, including, but not limited to, PAH as well as other severe and personal injuries that are permanent and lasting in nature, severe physical pain and suffering, emotional distress, mental anguish, diminished enjoyment of life, medical expenses, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a direct and proximate result of using ZELTIQ's CoolSculpting System.

223.    Ms. Evangelista further requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Ms. Evangelista is informed and believes and further alleges that Ms. Evangelista will in the future be required to obtain further medical and/or hospital care, attention, and services.

224.    By reason of the foregoing, Ms. Evangelist has been damaged as against ZELTIQ in the sum of fifty million dollars ($50,000,000.00).

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation)

225.    Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1 through 224 above as if set forth at length herein.

226.    As manufacturer of the CoolSculpting System, ZELTIQ possessed specialized and unique knowledge as to the risks and adverse effects associated with and reported after use of the CoolSculpting System.

227.    As manufacturer of the CoolSculpting System, ZELTIQ had a duty to warn consumers, like Ms. Evangelista, of the known, serious, adverse effect of PAH associated with CoolSculpting.

228.    ZELTIQ failed to exercise ordinary care and discharge its duty to warn of the all known serious health risks and adverse effects, including, but not limited to, the incidence and occurrence of PAH, associated with the CoolSculpting System as well as the potential need for invasive liposuction surgery to correct PAH, the extended recovery period following surgery, and the success rate of surgery.

229.   ZELTIQ negligently misrepresented the safety and efficacy of the CoolSculpting System to consumers, like Ms. Evangelista, and intentionally omitted and concealed material information concerning the incidence and occurrence of PAH.

230.    ZELTIQ knew that PAH was a serious, adverse effect of CoolSculpting, and intentionally misrepresented to consumers, like Ms. Evangelista, that the CoolSculpting System was safe and effective for its intended use and intentionally omitted material information by failing to disclose known health risks, including the incidence and occurrence of PAH following treatment, the need for invasive liposuction surgery to correct PAH, the lengthy and painful

recovery, the likelihood of success, and the risk of permanent bodily injury and disfigurement as a result.

231.    ZELTIQ breached its duty to consumers, including Ms. Evangelista, by negligently misrepresenting and failing to warn consumers of the serious health risks and adverse effects associated with use of the CoolSculpting System.

232.    Ms. Evangelista reasonably relied on ZELTIQ's misrepresentations that the CoolSculpting System was safe and effective – a quick and easy alternative to liposuction with minimal risk that required no surgery or downtime – and purchased seven CoolSculpting treatments to achieve the promise of a more-contoured appearance in her abdomen, flanks, back and bra area, inner thighs, and chin.

233.    ZELTIQ knew these representations to be false, misrepresented the safety and efficacy of CoolSculpting and intentionally concealed the risk of PAH associated with CoolSculpting to "drive consumable revenue."

234.    At the time she used ZELTIQ's CoolSculpting System, Ms. Evangelista was unaware of the falsity of ZELTIQ's representations and reasonably believed them to be true.

235.    Ms. Evangelista developed PAH as a direct and proximate result of using the CoolSculpting System, and underwent multiple (and costly) invasive, corrective liposuction surgeries at ZELTIQ's direction in an attempt to correct the PAH.

236.    Ms. Evangelista has suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of ZELTIQ's actions described herein.

237.    Had Ms. Evangelista not been misled about the risks associated with CoolSculpting, and about PAH in particular, she would not have used the CoolSculpting System.

238.    ZELTIQ made these representations and material omissions with knowledge of their falsity and the intent to deceive consumers, like Ms. Evangelista, and induce them to purchase and/or use its CoolSculpting System.

239.    ZELTIQ acted willfully, wantonly, and with reckless disregard for the safety and welfare of consumers, like Ms. Evangelista.

240.    Ms. Evangelista suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of ZELTIQ's actions described herein.

241.    Ms. Evangelista continues to experience serious and dangerous adverse effects, including, but not limited to, PAH as well as other severe and personal injuries that are permanent and lasting in nature, severe physical pain and suffering, emotional distress, mental anguish, diminished enjoyment of life, medical expenses, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a direct and proximate result of using ZELTIQ's CoolSculpting System.

242.    Ms. Evangelista further requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Ms. Evangelista is informed and believes and further alleges that Ms. Evangelista will in the future be required to obtain further medical and/or hospital care, attention, and services.

243.    By reason of the foregoing, Ms. Evangelista has been damaged as against ZELTIQ in the sum of fifty million dollars ($50,000,000.00).

## EIGHTH CAUSE OF ACTION
### (Fraud and Deceit)

244.    Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1 through 243 above as if set forth at length herein.

245.    ZELTIQ falsely and fraudulently misrepresented the safety and efficacy of the CoolSculpting System to consumers, like Ms. Evangelista, and intentionally omitted and concealed material information concerning the incidence and occurrence of PAH, a known serious adverse effect, with the intention that consumers, including Ms. Evangelista, would rely upon those misrepresentations and purchase its CoolSculpting System.

246.    ZELTIQ knew that PAH was a serious, adverse effect of CoolSculpting, and intentionally misrepresented to consumers, including Ms. Evangelista, that the CoolSculpting System was safe and effective for its intended use and intentionally omitted material information by failing to disclose known health risks, including the incidence and occurrence of PAH following treatment, the need for invasive liposuction surgery to correct PAH, the lengthy and painful recovery, the likelihood of success, and the risk of permanent bodily injury and disfigurement as a result.

247.    ZELTIQ distributed false and misleading information to the consumers, including Ms. Evangelista, regarding the safety and efficacy of the CoolSculpting System and intentionally omitted material information about the incidence and occurrence of PAH following CoolSculpting and/or deemphasized the actual risk of PAH associated with the CoolSculpting System as well as the fact that invasive surgery would be required to treat any PAH that develops.

248.   ZELTIQ represented that its CoolSculpting System was "safe" and "effective" and required "no surgery or downtime, so you're in and out of the office like always" in its promotional materials.

249.   ZELTIQ further marketed and advertised CoolSculpting as "safely deliver[ing] precisely controlled cooling to gently and effectively target the fat cells underneath the skin while leaving the skin itself unaffected."

250.   The ZELTIQ *Fear No Mirror* campaign, detailed *supra*, boasted "[n]o surgery, no anesthesia, no downtime" and everywhere characterized CoolSculpting as "non-surgical, safe, effective," making no mention of the known serious, adverse effect of PAH.

251.   ZELTIQ's television and video ads made similar representations that CoolSculpting was safe and effective, made no mention of PAH, and intentionally omitted any information regarding the incidence and occurrence of PAH after and as a result of using the CoolSculpting System.

252.   The information that ZELTIQ distributed to consumers, including Ms. Evangelista, in its direct-to-consumer advertising, marketing, and promotional materials intentionally misrepresented its CoolSculpting System as safe for its intended use.

253.   The information that ZELTIQ distributed to consumers, including Ms. Evangelista, in its direct-to-consumer advertising, marketing, and promotional materials intentionally misrepresented that its CoolSculpting System carried the same risks, hazards, and/or dangers as other similar and available products.

254.   The information that ZELTIQ distributed to consumers, including Ms. Evangelista, in its direct-to-consumer advertising, marketing, and promotional materials

intentionally included false representations that its CoolSculpting System was not injurious to the health and/or safety of its intended users.

255.    These and similar representations by ZELTIQ were false and misleading.

256.    ZELTIQ made these and similar false claims and misrepresentations with the intent of convincing consumers, including Ms. Evangelista, that its CoolSculpting System was safe, effective, and fit for its intended use.

257.    ZELTIQ made these and similar false claims and misrepresentations with the intent of convincing consumers, like Ms. Evangelista, that its CoolSculpting System did not pose any serious health risks or dangers beyond those identified and/or associated with other similar, available products.

258.    ZELTIQ made these false and misleading representations and others with the intention of deceiving and defrauding Ms. Evangelista, and others like her, and of inducing her to rely upon them and purchase the CoolSculpting System.

259.    ZELTIQ willfully and intentionally failed to disclose material facts regarding the dangerous and serious safety concerns of its CoolSculpting System by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of its CoolSculpting System, including the incidence and occurrence of PAH following treatment.

260.    ZELTIQ knew or should have known that consumers, including Ms. Evangelista, would rely upon the information it disseminated in its direct-to-consumer advertising, marketing, and promotional materials.

261.    ZELTIQ utilized a "targeted and strategic" direct-to-consumer campaign to advertise, market, and promote its CoolSculpting System.

262.   Ms. Evangelista reasonably relied on ZELTIQ's false and misleading representations regarding the safety and efficacy of the CoolSculpting System.

263.   Ms. Evangelista believed ZELTIQ's representations to be true at the time they were made and relied upon those representations and ZELTIQ's superior knowledge in choosing to use the CoolSculpting System and was thereby induced to purchase, use and rely on ZELTIQ's CoolSculpting System.

264.   At the time these representations were made, Ms. Evangelista did not know the truth regarding the serious health risks and dangerous adverse effects, including, but not limited to PAH, and/or safety concerns associated with use of ZELTIQ's CoolSculpting System.

265.   Ms. Evangelista did not discover the dangerous health risks, serious adverse effects and/or safety concerns or ZELTIQ's false representations regarding same, nor could Ms. Evangelista have discovered the true facts with reasonable diligence prior to using ZELTIQ's CoolSculpting System.

266.   Had Ms. Evangelista known the true facts with respect to the dangerous health risks, serious adverse effects, and/or safety concerns associated with ZELTIQ's CoolSculpting System, Ms. Evangelista would not have purchased, used and/or relied on the CoolSculpting System.

267.   ZELTIQ's conduct constitutes fraud and deceit and was committed and/or perpetrated willfully, wantonly and/or purposefully on Ms. Evangelista, and other consumers like her, with reckless disregard for her, or their, health, safety and well-being.

268.   Ms. Evangelista suffered severe and permanent physical injuries and disfigurement as a direct and proximate result of ZELTIQ's fraud and deceit.

269.   Had ZELTIQ not misled Ms. Evangelista about the health risks associated with CoolSculpting, and about PAH in particular, she would not have used the CoolSculpting System.

270.   Ms. Evangelista continues to experience serious and dangerous adverse effects, including, but not limited to, PAH as well as other severe and personal injuries that are permanent and lasting in nature, severe physical pain and suffering, emotional distress, mental anguish, diminished enjoyment of life, medical expenses, and a complete loss of income as a result of the physical injuries and permanent disfigurement that she suffered as a direct and proximate result of using ZELTIQ's CoolSculpting System.

271.   Ms. Evangelista further requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Ms. Evangelista is informed and believes and further alleges that Ms. Evangelista will in the future be required to obtain further medical and/or hospital care, attention, and services.

272.   By reason of the foregoing, Ms. Evangelista has been damaged as against ZELTIQ in the sum of fifty million dollars ($50,000,000.00).

### NINTH CAUSE OF ACTION
**(Violation of New York General Business Law §§ 349 and 350)**

273.   Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1 through 271 above as if set forth at length herein.

274.   ZELTIQ acted, used, and employed unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations, and knowingly concealed, suppressed and omitted material information with the intent that consumers, including Ms. Evangelista, rely upon same in connection with the advertisement, marketing, promotion, and sale of its CoolSculpting System in violation of New York consumer protection statutes,

General Business Law ("GBL") §§ 349 and 350, for the purpose of influencing and inducing consumers, including Ms. Evangelista, to purchase CoolSculpting treatments at a premium price.

275.     By reason of ZELTIQ's unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations, and knowing concealment, suppression, and omission of material information concerning serious, known adverse effects, including, but not limited to, the incidence and occurrence of PAH associated with CoolSculpting treatment, Ms. Evangelista, a reasonable consumer acting reasonably, was caused to suffer actual damages, physical injuries and economic loss.

276.     ZELTIQ engaged in consumer-oriented, commercial conduct by advertising, marketing, promoting, and selling the CoolSculpting System as described herein.

277.     ZELTIQ's advertising, marketing, promotion, and sales practices misrepresent to consumers that the CoolSculpting System is safe and effective for its intended use and omits material information by failing to disclose serious, known adverse effects, including, but not limited to, the incidence and occurrence of PAH following treatment.

278.     ZELTIQ's misrepresentations and omissions of material information, described herein, constitute unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations and/or the knowing concealment, suppression, or omission of material facts with the intent that reasonable consumers, like Ms. Evangelista, rely on same in connection with its advertising, marketing, promotion, and sale of the CoolSculpting System in violation of GBL §§ 349 and 350.

279.     ZELTIQ's unlawful, false, misleading, and deceptive marketing practices lead customers to believe that they are purchasing, for a premium price, a safe and effective, non-invasive alternative to liposuction with minimal health risk and/or adverse effects.

280.    Reasonable consumers must, and do, rely on ZELTIQ's overall advertising, marketing and promotion of the CoolSculpting System, including, without limitation, website, television, radio, print media, posters, office displays, and promotional brochures provided to its customers through ZELTIQ's direct-to-consumer advertising and marketing campaigns and by CoolSculpting System providers.

281.    As such, reasonable consumers remain unaware of the true health risks and serious, adverse effects associated with the use of the CoolSculpting System.

282.    By employing these advertising, marketing, promotional, and sales tactics, ZELTIQ intends for consumers to rely on its representations of safety and efficacy, and Ms. Evangelista (as well as members of the general consuming public) remain subject to ZELTIQ's deceptive, false, and misleading advertising.

283.    ZELTIQ violated New York consumer protection statutes, GBL §§ 349 and 350, by failing to disclose known health risks and serious adverse effects, including, but not limited to, the incidence and occurrence of PAH following treatment.

284.    If Ms. Evangelista knew about the actual health risks and adverse effects associated with the CoolSculpting System, including, but not limited to, the incidence and occurrence of PAH, Ms. Evangelista would not have purchased and undergone CoolSculpting treatment.

285.    By employing the advertising, marketing, promotion and sales tactics illustrated herein, and by failing to advise consumers, including Ms. Evangelista, of known health risks and adverse effects, including, but not limited to, the incidence and occurrence of PAH following treatment, ZELTIQ engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations, knowingly concealing, suppressing and

omitting material information with the intent that reasonable consumers, including Ms. Evangelista, rely upon such misrepresentations, false impressions, deceit, suppressions, and omissions, and thousands of reasonable consumers, including Ms. Evangelista, did in fact so rely.

286.    As a result of ZELTIQ's unconscionable commercial practices, and its false, misleading, and deceptive advertising, marketing, promotion, and sale of CoolSculpting, Ms. Evangelista has suffered actual damages, permanent physical injuries, and economic loss, detailed *supra*.

287.    New York consumer protection statutes, GBL §§ 349 and 350, were enacted to protect consumers from deceptive, fraudulent, and unconscionable trade and business practices and false advertising like that in which ZELTIQ has engaged in the advertising, marketing, promotion, and sale of its CoolSculpting System.

288.    ZELTIQ engaged in the deceptive acts and practices and false and misleading advertising, detailed herein, in violation of GBL §§ 349 and 350 in order to sell the CoolSculpting System to consumers at large, like Ms. Evangelista.

289.    As a direct and proximate result of ZELTIQ's deceptive, fraudulent, and unconscionable trade and business practices and false advertising, detailed herein, in violation of GBL §§ 349 and 350, Ms. Evangelista has suffered actual damages, physical injuries, and economic loss.

**<u>TENTH CAUSE OF ACTION</u>**
**(Promissory Estoppel)**

290.    Ms. Evangelista incorporates by reference the allegations set forth in paragraphs 1 through 289 above as if set forth at length herein.

291.    Ms. Evangelista was diagnosed with PAH in or around June 2016.

292.     Ms. Evangelista reported her adverse reaction following use of the CoolSculpting System to ZELTIQ immediately thereafter.

293.     ZELTIQ advised Ms. Evangelista that she would need to undergo corrective liposuction surgery to remove the fat growths that developed as a result of her CoolSculpting treatment and referred Ms. Evangelista to ZELTIQ's Preferred Doctor.

294.     ZELTIQ's Preferred Doctor's patient notes indicate that Ms. Evangelista was sent to him by ZELTIQ to correct increased fat following her CoolSculpting treatment and that she suffered from "significant areas of fatty hyperplasia."

295.     ZELTIQ directed and arranged for Ms. Evangelista to undergo "corrective" liposuction surgery with ZELTIQ's Preferred Doctor.

296.     ZELTIQ represented and promised Ms. Evangelista that it would cover the cost of her "corrective" liposuction surgery and Ms. Evangelista reasonably relied upon that representation and promise when she consulted and scheduled "corrective" liposuction surgery with ZELTIQ's Preferred Doctor.

297.     On the eve of Ms. Evangelista's surgery, ZELTIQ attempted to force to Ms. Evangelista into executing a Confidentiality Agreement and Release by conditioning its promise of payment on Ms. Evangelista signing a Confidentiality Agreement and Release whereby she would agree to release ZELTIQ from any and all claims and to keep the terms of the Agreement and Release confidential.

298.     ZELTIQ knew that Ms. Evangelista was financially obligated and bound by hospital policy and/or ZELTIQ's Preferred Doctor to cover the cost of her surgery that was scheduled to take place less than 24 hours later when it attempted to force her into signing a Confidentiality Agreement and Release.

299.    Ms. Evangelista refused to sign the Confidentiality Agreement and Release and ZELTIQ refused to pay the cost of Ms. Evangelista's "corrective" liposuction surgery.

300.    Ms. Evangelista consulted and scheduled "corrective" liposuction surgery with ZELTIQ's Preferred Doctor at ZELTIQ's direction and on reliance on ZELTIQ's representation and clear and unambiguous promise that it would cover the cost of her surgery.

301.    As ZELTIQ well knew, Ms. Evangelista was unable to cancel and financially obligated to cover the cost of her surgery when ZELTIQ reneged on its promise to pay less than 24 hours before the scheduled surgery.

302.    To date, ZELTIQ has not reimbursed Ms. Evangelista for any of the costs or expenses associated with the "corrective" liposuction surgery that ZELTIQ directed her to undergo as promised.

303.    ZELTIQ directed Ms. Evangelista to undergo "corrective" liposuction surgery with ZELTIQ's Preferred Doctor and clearly and unambiguously promised Ms. Evangelista that it would pay the cost of that surgery.

304.    Ms. Evangelista reasonably relied on ZELTIQ's promise and underwent "corrective" liposuction on July 22, 2016.

305.    As a result of ZELTUQ's failure to pay for Ms. Evangelista's "corrective" liposuction surgery as promised, Ms. Evangelista has been damaged in the sum of approximately $38,000.00.

## **PRAYER FOR RELIEF**

   **WHEREFORE**, Ms. Evangelista demands judgment against the ZELTIQ on each of the above-referenced claims and causes of action and as follows:

         a.    Awarding compensatory damages in the amount of $50,000,000 to Ms.

Evangelista for past and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Ms. Evangelista, health care costs, medical monitoring, lost business opportunities, together with interest and costs as provided by law;

b.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of ZELTIQ which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Ms. Evangelista in an amount sufficient to punish ZELTIQ and deter future similar conduct;

c.      Awarding Ms. Evangelista reasonable attorneys' fees;

d.      Awarding Ms. Evangelista the costs of these proceedings; and

e.      Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff Linda Evangelista hereby demands trial by jury as to all issues.

Dated: New York, New York
           September 21, 2021

WROBEL MARKHAM LLP


By:    /s
           Daniel F. Markham
           1407 Broadway, Suite 4002
           New York, NY 10018
           Tel: (212) 421-8100
           dmarkham@wmlawny.com
           *Attorneys for Plaintiff Linda Evangelista*