```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LINDA EVANGELISTA,

                Plaintiff,

        v.                              21-cv-7889 (VEC)

ZELTIQ AESTHETICS, INC.,

                Defendant.              Conference
------------------------------x
                                        New York, N.Y.
                                        (remote)

                                        December 7, 2021
                                        4:00 p.m.

Before:

              HON. VALERIE E. CAPRONI

                                        District Judge


                        APPEARANCES

WROBEL MARKHAM LLP
     Attorneys for Plaintiff
BY:  JENNIFER M. MULLER
     JODIE GERARD
     DANIEL F. MARKHAM

SILLS CUMMIS & GROSS, P.C.
     Attorneys for Defendant
BY:  BETH S. ROSE
     VINCENT R. LODATO
     -and-
BUTLER SNOW LLP
     Attorneys for Defendant
BY:  ALYSON B. JONES
     ORLANDO R. RICHMOND SR.
```

1             (Remote)
2             THE COURT:  Hi.  This is Judge Caproni.  Who just
3    joined?
4             MS. JONES:  Alyson Jones from Butler Snow on behalf of
5    Zeltiq.
6             THE COURT:  We're still waiting for the plaintiff to
7    join.
8             MS. JONES:  OK.  Thank you.
9             THE COURT:  Hi.  This is Judge Caproni.  Who just
10   joined?
11            MR. MARKHAM:  Hi, your Honor.  This is Dan Markham.
12   I'm counsel for the plaintiff, Linda Evangelista.
13            THE COURT:  OK.  That means we've got everybody.
14            Let me remind everybody of the rules of a telephone
15   conference.  If you're in an area where there's ambient noise,
16   please mute your phone when you're not talking.  Please
17   identify yourself each time before you speak.  And if you hear
18   the bell that indicates someone has come or left, please stop
19   talking long enough for me to make sure that I still have the
20   court reporter on the line.
21            I understand that this is a discovery dispute
22   specifically over the scope of medical records that the
23   defendant has requested.  Mr. Markham, why don't you lay out
24   what you're objecting to.
25            MR. MARKHAM:  OK, your Honor.  Thank you.

1          Just as a background, before this case was even filed,
2     we supplied four medical releases for four different providers
3     who either performed the procedures at issue in the case or who
4     performed follow-up surgeries to try to repair the damage that
5     was caused by the CoolSculpting procedures.  And to that end,
6     we've produced already before this case was filed 8 gigabytes
7     of information.
8          Contained in that information, those medical records,
9     are names of other providers that my client has seen over the
10    years, including her oncologist, her general practitioner, etc.
11    We have asked defendant's counsel to justify why, for example,
12    my client's cancer records would be relevant to the claims that
13    she has asserted.
14         Now, I understand she put her mental condition at
15    issue, claiming mental anguish, and we've already sent over a
16    medical release for her therapist.  But these other doctors do
17    not have any bearing on the pain and suffering or the physical
18    damages that she's alleged that were caused by the
19    CoolSculpting procedure.
20         And so we've had colloquy, emails, and phone calls
21    trying to limit at least some of the concerns that defendant's
22    counsel have had, and we've tried to work through specific
23    interests that they may have that we may be able to provide
24    information regarding, but we will not -- well, we have not --
25    agreed to an unfettered rummaging through my client's medical

1   records.

2           THE COURT:  So.

3           MR. MARKHAM:  That's where we are at.

4           THE COURT:  Well, to be clear, this is an issue of the
5   oncologist and the general practitioner?  Is there any other
6   particular healthcare provider that the plaintiff is objecting
7   to providing the releases for?

8           MR. MARKHAM:  Yes, your Honor.  So if I go down the
9   list, there are six doctors.  One is a GP.  One is her
10  oncologist.  One is the surgeon who performed surgery relating
11  to her cancer.  One is a geneticist.  One is a plastic surgeon
12  who performed some plastic surgery well before my client had
13  ever undergone CoolSculpting procedures.  And the sixth doctor
14  is a gastroenterologist, which is, you know, her stomach issues
15  are not at all at issue in this case.

16          THE COURT:  All right.  So, Ms. Jones, why do you need
17  all these records?

18          MS. JONES:  Yes.  Specifically, our position is that
19  we are entitled to the full medical history as it relates to
20  her, first the physical condition and her mental health status,
21  because they are the exact injuries she's putting at issue.
22  Ms. Evangelista specifically claims that she's unable to work
23  and that she has been permanently disfigured with respect to
24  the physical injuries.

25          And so, in order for us to sufficiently obtain and

1   discover relevant information to her claimed damages, we are
2   entitled to collect medical records as it relates to
3   specifically the providers he referenced that have been
4   referenced, but those are the only ones identified by a very
5   small subset of records that has been provided to date.
6           How this came about is, because the Court has a
7   deadline of November 19, 2021 to provide a medical
8   authorization, we requested that plaintiff provide a general
9   authorization that would allow us to determine the relevant
10  providers and to collect the medical records, to which
11  plaintiff's counsel objected, and now we're trying to work
12  through a more -- a list.  And this is a process by which we
13  identify a specific provider and then he'll either object or
14  tell us -- or give us the authorization, which is going to be a
15  very piecemeal fashion as we continue through this litigation.
16  And so our request is actually that she be required to execute
17  a general authorization for both her medical records and her
18  psychological records so that we can identify the relevant
19  providers and collect the records.  And so that is why we've
20  raised this with the Court.
21          I will mention that this is preliminary, meaning that
22  our responsive pleading is due a week from today, December 14,
23  in which we'll be moving to dismiss the claims.  And so this is
24  putting a discovery dispute ahead of those determinations, but
25  in accordance with the deadlines that have been set by the

1  Court for discovery, a fundamental part of that is our ability
2  to collect medical records.  We don't know what we don't know.
3  We have to have the record, in a personal injury lawsuit where
4  she's put the issues at the forefront.  These are her claimed
5  damages.  And we are entitled to collect records in order to
6  determine -- even to determine what the status of her damages
7  are.
8          And this is not admissibility at this point, and this
9  is not a fishing escapade or trying to get into her -- areas
10 that are not relevant, but this is just a discoverability
11 issue, and the medical records are central to her claim
12 damages.
13         MR. MARKHAM:  Your Honor, may I respond?  This is Dan.
14         THE COURT:  Yes, Mr. Markham.
15         MR. MARKHAM:  I would just say that whatever --
16 everything that Ms. Jones has said, unfortunately, that's not
17 the law in New York State or in this district.  And the case
18 law is clear that when a plaintiff puts her medical or mental
19 condition at issue, she only waives her privacy rights as to
20 that particular ailment that has caused her emotional distress
21 or injury.
22         THE COURT:  How do they -- I'm sorry.  Let me
23 interrupt you for a second.
24         MR. MARKHAM:  Yes.
25         THE COURT:  What defendant is saying is, your client

1    is saying that she is unable to work because of their,
2    whatever, their device or their product or their -- whatever --
3    I'm not sure what we call this thing, but whatever.  And
4    they're entitled to defend on the grounds of, that's not true,
5    your client is unable to work because she had cancer, because
6    of the surgery from the cancer, because of some other medical
7    condition that is interfering with her ability to work.
8              MR. MARKHAM:  Well, I understand that, your Honor, but
9    what they've asked for is a general medical authorization to go
10   into every doctor my client has ever seen and rummage through
11   her medical records.  That's just not the way things are done
12   in the Southern District in my experience or in New York State.
13             So to the extent -- and I've had this conversation
14   with Ms. Jones -- to the extent that she can -- like, for
15   example, she raised my client's weight.  To the extent that
16   there are records in her general -- her GP medical records that
17   go to her weight, maybe -- you know, I agree.  If she was --
18   since she had a weight problem, for a model, before the
19   CoolSculpting procedures, that's relevant.  We'd be happy to
20   share that information.  It's just that this, you know,
21   "Provide me with medical records for doctors, I don't even know
22   who they are, and we're going to go and look at all your
23   medical records," that's way overbroad and that is something
24   that the courts in this district have never allowed.
25             THE COURT:  Well, but at the moment what we're talking

1  about, while it is true that Ms. Jones would like a general
2  medical release, at the moment what you've identified is an
3  oncologist, a general practitioner, a surgical oncologist --
4  put aside the geneticist for a second.  I'm having some
5  difficulty understanding the relevance of that.  Plastic
6  surgery, surgeon, you say from well before the CoolSculpting
7  but I don't know what that means.  And a gastroenterologist.
8  All of whom I could see, again other than the geneticist,
9  having information that would be relevant to whether it was the
10 CoolSculpting procedure that made her unable to work or whether
11 there were other medical conditions that are interfering with
12 her ability to work.
13          When was the CoolSculpting procedure done?
14          MS. JONES:  2015.
15          MR. MARKHAM:  Sorry.  There were seven procedures.
16 They started in August of 2015 and went through February of
17 2016.  And it wasn't until several months after the last
18 treatment that she developed this, we call it PAH, paradoxical
19 adipose hyperplasia, hardened fat tissue that protrudes from
20 her body wherever the device was placed.
21          THE COURT:  Why isn't one way of skinning this cat,
22 put a time limit on the records that the defendant can get.
23 And there's a point where if they're very remote in time I
24 can't possibly see how they're relevant, how they're
25 sufficiently relevant to warrant discovery.  Ms. Jones?

1           MS. JONES:  Yes.  We can agree, I agree that that
2   limitation would be appropriate.  And it could be from the date
3   of her CoolSculpting treatment, and so three years prior, which
4   was August 2015, would be -- we would understand that there
5   could be a limitation for that.  I would maybe argue five years
6   but I would agree to three years.
7           THE COURT:  Three years before the beginning of the
8   CoolSculpting?
9           MS. JONES:  Correct.
10          THE COURT:  Mr. Markham?
11          MR. MARKHAM:  Well, my experience in the Southern
12  District, your Honor, is that three years is often considered
13  to be a reasonable amount of time.  So I could not object to a
14  three-year, you know, retroactive period.
15          THE COURT:  So medical records, then, from August 2012
16  forward.
17          MR. MARKHAM:  Right.
18          THE COURT:  OK?
19          For these -- why do you need the geneticist,
20  Ms. Jones?
21          MS. JONES:  The geneticist, Ms. Evangelista, from our
22  review, again a review of a limited set of records, these are
23  the initial physicians we've been able to identify, the
24  geneticist, she has a condition that is specific -- that will
25  prevent her from being able to -- I don't know the full extent

1   of it, but it does cause her some potential fatigue and
2   inability to kind of function as a normal person.  And that may
3   lead to her inability to work.  And it also may cause some type
4   of skin, like lesions.  She is a model.  And so any kind of
5   physical appearance that would keep her from being able to be
6   on the cover of a magazine, for example, would be relevant to
7   her damages.  So that's my understanding.  But it is a very
8   rare genetic condition, and I don't know the full extent of it
9   yet.
10          MR. MARKHAM:  Right.
11          THE COURT:  Well, Mr. Markham, what's this normal -- I
12  am not an expert of this, but my understanding of what
13  geneticists do, geneticists are typically providing advice on
14  whether conditions will be passed on to children or if there's
15  a reason why, from a genetic perspective, people should not be
16  having children or what the risks are, etc.  Why was she at a
17  geneticist?
18          MR. MARKHAM:  Well, your Honor, that, I'll be honest
19  with you, I haven't -- I haven't asked her a specific question
20  why she was at the geneticist.  I can tell you that, from 1984
21  through 2016, she was possibly the most photographed model in
22  the world.  So there were, you know, based on that alone, there
23  was -- lesions on her face or anything that could prevent her
24  from working, she worked for those decades and was -- like I
25  said, possibly the most photographed model in the world.  So,

1  you know --
2           THE COURT:  OK.
3           MR. MARKHAM:  I assume that being an issue here.
4           THE COURT:  Let's put the geneticist on hold.
5  Ms. Jones, if you develop more information and there's
6  something about the geneticist that has unique information that
7  these other doctors don't have, then meet and confer, and if
8  you can't work it out, come back to me.  But for now, that
9  seems, that one seems a little far afield, without having a
10 better feel for why you're interested in it.
11          As to the other doctors that have been identified, so
12 the oncologist, the general prac -- the GP, surgical
13 oncologist, plastic sur -- when was the plastic -- you said the
14 plastic surgery was from well before the CoolSculpting?  When
15 was it?
16          MR. MARKHAM:  Well, my understanding -- she, to the
17 best of her recollection, it was several years before the first
18 CoolSculpting.  So that would have been in 2015.  So we're
19 talking a few years before then.
20          THE COURT:  OK.  Well then --
21          MR. MARKHAM:  And there was some eye work done, work
22 done under her eye.
23          THE COURT:  OK.  Unlikely to be particularly relevant,
24 but if it's within the three years, provide it.  If not, you
25 don't have to provide it.  Same with the gastroenterologist.

1            MR. MARKHAM:  OK.

2            MS. JONES:  Yes, your Honor.  And if I could just

3   interject one thing with specificity to plastic surgeons and

4   just for the benefit of if we have to have continued

5   conversations about this.  So the process of consenting is

6   going to be at issue here.  And so to the extent that there's

7   consenting that's done in particular in reference to plastic

8   surgery, that would be of specific relevance to the claims at

9   issue as well.  So I just raise that with respect to plastic

10  surgery, recognizing there's a time frame.  I understand the

11  Court's ruling on that.

12           THE COURT:  OK.  Anything further that I can do?

13           MR. MARKHAM:  Not from my perspective, your Honor.

14  Thank you.

15           THE COURT:  Ms. Jones?

16           MS. JONES:  No.  This has been helpful.  Thank you,

17  your Honor.

18           THE COURT:  All right.  Thanks, everybody.

19           (Adjourned)